# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2207 | **DATE** | 6/25/2004 |
| **CASE TITLE** | Blue Air, Inc. vs. Soleus Mobility, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, plaintiff's motion for a preliminary injunction [2-2] is denied. Status hearing is set for scheduling conference on 7/8/04 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUN 28 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | 18 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 6/25/2004 date mailed notice | |
| MD | courtroom deputy's initials | 2004 JUN 28 PM 2:51 FILED | MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

BLUE AIR, INC., )
)
    Plaintiff, )
)
vs. ) No. 04 C 2207
) Judge Joan H. Lefkow
SOLEUS MOBILITY, INC. and )
MJC AMERICA, INC., )
)
    Defendant. )
)

## MEMORANDUM OPINION AND ORDER

Plaintiff, BlueAir, Inc. ("BlueAir"), filed this action against defendants, Soleus Mobility, Inc. ("Soleus") and MJC America, Ltd. ("MJC"), for trade dress infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125, and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* Before the court is BlueAir's motion for a preliminary injunction. The court held a hearing on the motion on June 10, 2004. For the reasons stated below, the motion is denied.

## FACTS

"Most air purifiers are plain ugly and by preference you would want to hide them somewhere." (Website for Allergy Buyers Club, Pl. Ex. 9, at 3.) In the 1980s, Bengt Rittri, the founder and President of BlueAir, set out to change this. Reversing the principle that form follows function, Rittri hired a New York designer to design a cabinet for an air purifier that was "pleasing in overall image and appearance." (Pl. Mot., at 3.) Only then did Rittri design "the

layout of the internal working parts -- which were then fitted into the cabinet differently for each model" of Blue Air purifier. (*Id.* at 2.) Since at least February, 1998, BlueAir has imported and sold the resulting "contemporary," "sleek," "distinctive" air purifiers in the United States under the BlueAir trademark. (*Id.* at 2, 3.) BlueAir markets its purifiers in such top stores as Sharper Image, Bed Bath and Beyond, Brookstone, Linens & Things, and others. BlueAir's 501 model costs around $600.

Rittri's efforts have not gone unnoticed. BlueAir's purifiers, including the 501 model and its 301, 402, and 601 mates, have been lauded for their "distinctive design and appealing presentation." (*Id.* at 2.) In fact, the 402 model has received several European design awards and is featured in a permanent design exhibit at the National Museum in Stockholm, Sweden. (*Id.*) The hallmarks of BlueAir's "sleek, stylish, and contemporary look" are

1. Slightly outwardly curved, solid, rectangular front and rear panels;

2. Light, putty color of the front and rear panels;

3. Circular depression with centered clear bulb at the upper left of the front panel, with the "Blue Air" name beside it;

4. Horizontal detail line extending across most of the front panel;

5. Dark castors under the base; and,

6. Dark, planar edge panels joining the front and back panels at top and sides.

(*Id.*) None of the perhaps two dozen other air purifiers appearing in on-line U.S. catalogs has this combination of elements.

2

Thus, it is not difficult to understand Rittri's dismay when he discovered that MJC[1] was preparing to market the Soleus Air SA-550 ("SA-550"), an air purifier that bears a remarkable resemblance to the BlueAir 501 purifier. Like the BlueAir 501, the SA-550 has slightly outwardly curved, solid, rectangular putty-colored front and rear panels, a horizontal detail line extending across the front panel, dark castors under the base, and dark, planar edges joining the front and back panels at the top and sides. MJC's Secretary, Jimmy Loh ("Loh"), admits that MJC copied certain aspects of the BlueAir 501's design. MJC's promotional material even touts the SA-550's "award-winning Swedish design."[2] (Pl. Ex. 8.) However, MJC insists that the SA-550 differs from the BlueAir 501 in several material respects, including

1. the SA-550 has a "soft-touch" control on top of the unit with a remote control, while the BlueAir 501 has a manual control on the right side of the unit;

2. the SA-550 has a circular depression with an infrared sensor at the upper left of the front panel, with the name "Soleus" next to the depression, while the BlueAir 501 has a circular depression with an "on" indicator lamp at the upper left of the front panel, with the name "BlueAir next to the depression;

3. the SA-550 has ultraviolet tubes, while the BlueAir 501 does not;

4. the SA-550 has a one-way airflow output, while the BlueAir 501 has a three-way air output;

5. the SA-550 has a five-way airflow input, while the BlueAir 501 has a three-way airflow input;

6. the dimensions of the models are not identical;

---

[1] Defendants claim that Soleus "does not sell air purifiers and appears to have been sued in error." (Pl. Resp., at fn. 2.) Though defendants have not filed a motion to dismiss Soleus from this action, the court will refer to MJC as the defendant for the purposes of this motion.

[2] The court has received no evidence suggesting that the SA-550 has won any design awards, nor that MJC has any connections with Sweden.

3

7. the SA-550 has a removable power cord on the right side, while BlueAir has a power cord on the bottom.

(Def. Resp., at 3.) The SA-550 has a retail price of approximately $400.

At the hearing on the motion for preliminary injunction, Rittri testified to two other facts relevant here. First, Rittri testified that BlueAir has engaged in "co-branding" campaigns with other manufacturers and/or retailers of air purifiers, including Sharper Image, Aerus, Gesundheit, and Lux. Some of the air purifiers marketed as part of these co-branding campaigns did not bear the BlueAir trademark but were instead labeled with the mark of the co-branding partner. Others bore both the BlueAir trademark and the name of the co-branding partner. (Transcript at 42.) Second, Rittri testified that he had read studies indicating that buyers of air purifiers spend more time researching their potential purchase than buyers of almost any other product. (Transcript at 62, 89.)

## DISCUSSION

The party requesting a preliminary injunction in a trade dress or unfair competition case has the burden of demonstrating (1) a reasonable likelihood of success on the merits of the underlying claim; (2) no adequate remedy at law; and, (3) irreparable harm if the injunction is not granted. *Jones v. InfoCure Corp.*, 310 F.3d 529, 534 (7th Cir. 2002). If an evaluation of these three points indicates that an injunction might be proper, the court then weighs the potential harms to the parties and takes into account whether the public interest will be disserved if the injunction issues. *Id.* "A preliminary injunction is an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Chicago Dist.*

*Council of Carpenters Pension Fund* v. *K & I Construction, Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001).

A. *Reasonable Likelihood of Success on the Merits*

Section 43(a) of the Lanham Act gives a producer of a product a cause of action for the use by any person of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a). The breadth of the confusion-producing elements recited as actionable under § 43(a) has been held to include not just word marks, such as "Nike," and symbol marks, such as Nike's "swoosh" symbol, but also "trade dress" -- a category that originally included only the packaging, or "dressing," of a product, but has been expanded to encompass the design of a product. *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U.S. 205, 209 (2000); *see also TrafFix Devices, Inc.* v. *Marketing Displays, Inc.*, 532 U.S. 23 (2001); *Eco Manufacturing LLC* v. *Honeywell International, Inc.*, 357 F.3d 649 (7th Cir. 2004). Trade dress refers to "the total image of a product, including size, shape, color combinations, graphics, packaging and label." *Badger Meter, Inc.* v. *Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994).

To prevail on a claim of trade dress infringement, a plaintiff first must show that 1) its trade dress is either inherently distinctive or has acquired a secondary meaning, and 2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *Thomas & Betts Corp.* v. *Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). If the plaintiff successfully establishes these elements, the defendant can still prevail if the defendant demonstrates that the plaintiff's trade dress is functional. *Id.*

5

1. *Inherent Distinctiveness or Secondary Meaning*

BlueAir seeks trade dress protection for the overall product design of its air purifiers. The Supreme Court has held that product design is not inherently distinctive. *Wal-Mart*, 529 U.S. at 214 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist."). Thus, "product design cannot be protected under § 43(a) without a showing of secondary meaning." *Id.* "'[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of the product feature . . . is to identify the source of the product rather than the product itself.'" *Thomas & Betts*, 138 F.3d at 291 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995)). Secondary meaning can be established "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id.*

BlueAir primarily relies on two of these factors to show that its trade dress has acquired a secondary meaning: length and manner of use and proof of intentional copying. First, BlueAir points out that it has "sold or marketed the trade dress of its models 401, 501, 402, and/or similar air purifiers in the United States continuously and exclusively since 1987 via mailed catalogs . . . and then further for the past 6 years by direct sales to retailers . . . ." (Pl. Reply, at 2.) BlueAir contends that its use of its trade dress for more than five years "provides *prima facie* proof of secondary meaning." (*Id.*, at 3, citing *Thomas & Betts*, 138 F.3d at 296.) However, contrary to BlueAir's assertion, the Seventh Circuit has not held that use of trade dress for more than five years provides *prima facie* proof of secondary meaning. Rather, in *Thomas & Betts*, the court held that more than five years' use of trade dress "has some bearing on the issue of secondary

meaning." 138 F.3d at 296. Furthermore, the significance of the length of use of trade dress depends on the "manner of use." *Id.* at 291 (Secondary meaning can be established "through . . . the length *and manner* of use.").

Here, BlueAir's use of its trade dress for the past six years has not been "exclusive." BlueAir has engaged in "co-branding" campaigns with other manufacturers and/or retailers of air purifiers, including Sharper Image, Aerus, Gesundheit, and Lux. Some of the purifiers marketed as part of these co-branding campaigns did not bear the BlueAir name but were instead labeled with the mark of the co-branding partner. Others bore both the BlueAir trademark and the name of the co-branding partner. Though no court has addressed the issue, legal scholars have argued that such co-branding may result in mixed consumer perception as to the source of the product, diluting the secondary meaning of a products trade dress. *See* Donald R. Kirk, *Franchise Dual-Branding: The Irony of Association*, 10 DePaul Bus. L.J. 1 (1997)("'[D]ual-branding' promises to blur the consumers' perception of where a product or service that they are buying originates."); Ann Hurwitz, *Co-Branding: Managing Franchise Brand Associations*, 20 Okla. City. U.L. Rev. 373, 379 (1995)("[C]o-branding may result in mixed consumer perception, leading to confusion and, eventually, a possible diminution in value of participating brands."). The court agrees. BlueAir has allowed its air purifiers to be marketed bearing the name of other brands, sometimes only bearing the name of another brand. Such co-branding could only weaken a consumer's perception of the source of the product. Thus, while BlueAir's use of its trade dress for more than five years is not irrelevant, the court finds its significance minimal here.

BlueAir's second argument that its trade dress has acquired secondary meaning is that MJC intentionally copied BlueAir's trade dress. BlueAir contends that "proof of Soleus's

7

slavish, 'Chinese' copying" (an unfortunate choice of words, given that they might be interpreted as disparagement based on nationality) of BlueAir's trade dress "supports a presumption that the plaintiff's trade dress is both distinctive and has a secondary meaning." (Pl. Reply, at 7, 5.) In support of this contention, BlueAir cites *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1182 n.13 (7th Cir. 1989). However, in *Schwinn*, the court explicitly held that proof of intentional copying does not create a presumption of secondary meaning. The court stated,

> [s]ome courts have employed a presumption of "secondary meaning" where the second manufacturer of a product deliberately and closely copies the trade dress of the first manufacturer of a product. We have not gone so far; rather, proof of intentional copying is probative evidence of "secondary meaning."

*Id.* (citing *Vaughan Mfg. Co. v. Brikman Int'l, Inc.*, 814 F.2d 346, 348 (7th Cir. 1987). Thus, while MJC's copying of BlueAir's product design is relevant, it is not dispositive.

Given that the Supreme Court has stated that "product design almost invariably serves purposes other than source identification," *Wal-Mart*, 532 U.S. at 213, BlueAir bears an especially high burden of persuading the court that its product design has acquired a secondary meaning. It has failed to meet that burden. Considering the evidence in its entirety, the court finds that BlueAir has not demonstrated that "in the minds of the public, the primary significance of [BlueAir's trade dress] is to identify the source of the product rather than the product itself." *Thomas & Betts*, 138 F.3d at 291 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995)). As discussed above, BlueAir's use of its trade dress for more than five years has "some bearing on the issue of secondary meaning." *Thomas & Betts*, 138 F.3d at 296. However, the probative value of this evidence is slight given BlueAir's co-branding of its air purifiers. Furthermore, the significance of MJC's intentional copying of BlueAir's product design is

8

minimal in the absence of some evidence that the public viewed BlueAir's design as signifying "the source of the product rather than the product itself." As the Supreme Court noted in *TrafFix*,

> Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. Allowing competitors to copy will have salutary effects in many instances.

532 U.S. at 29 (internal citations omitted). Thus, BlueAir has failed to establish that its trade dress has acquired a secondary meaning.

2. *Likelihood of Consumer Confusion*

BlueAir has likewise failed to show that the similarity of the MJC's trade dress "causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products." *Thomas & Betts Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). Among the factors considered by courts in determining the likelihood of consumer confusion are (1) the similarity of the trade dresses; (2) the area and manner of concurrent use; (3) the degree of care likely to be used by consumers; (4) the strength of plaintiff's trade dress; (5) actual confusion; and (6) intent of the defendant to pass off its product as that of the plaintiff. *Thomas & Betts*, 138 F.3d at 296. When considering whether there is a likelihood of confusion, none of these factors considered alone is dispositive, and the weight to be accorded to each varies from case to case. *Id.*

MJC suggests that there are significant differences between the SA-550 and the BlueAir 501. The court disagrees. Whatever differences exist between the two air purifiers, they are minor in comparison to the overwhelming similarities. Nevertheless, Rittri testified that he had

9

read studies indicating that consumers of air purifiers spend more time researching the products than almost any other product. If this is true, such consumers are unlikely to be confused as to the source or affiliation of the air purifiers they are buying. BlueAir's unsupported contention that consumers "may exercise a great deal of care but are likely to be confused nonetheless" is unconvincing. While it is certainly possible that consumers could be confused, it seems likely that consumers who spend the most time researching a product are the least likely to be confused.

BlueAir also contends that, because MJC admittedly copied BlueAir's product design, MJC "intended to pass off its air purifier as BlueAir's." (Pl. Mot., at 7.) This is simply conjecture. It is equally likely that MJC noticed that BlueAir's air purifiers were selling well, inferred that customers liked air purifiers with a "sleek, stylish, and contemporary look," and decided to climb on the bandwagon. "We call that competition, not bad faith, provided there is no intention to confuse." *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995). BlueAir has presented no evidence that MJC intended to confuse consumers or that customers were in fact confused.

Finally, the trade dresses of MJC and BlueAir have different "areas and manners of concurrent use." BlueAir and MJC use substantially different marketing channels. BlueAir markets its 501 model to "high-end" retailers and consumers, while MJC sells the SA-550 to nationwide "mass merchant" retailers for a retail price of approximately $200 less than the BlueAir 501. Though BlueAir has indicated that it plans to enter the "mass market" very soon, it has not yet done so, and the court will not speculate about what will happen if and when it does. Thus, BlueAir has failed to make a clear showing that consumers are likely to be confused as to the source or affiliation of the products.

## CONCLUSION

Given that BlueAir has failed to establish a reasonable likelihood of success on the merits, the court need not examine the other elements required for a preliminary injunction. BlueAir's motion for a preliminary injunction is denied [#2-2].

ENTER: *[signature]*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: June 25, 2004